CRANSTON PRINT WORKS *vs.* FRANK PASCATORE.

MAY 8, 1947.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

BAKER, J. This is a petition for review brought under the provisions of the workmen's compensation act, general laws 1938, chapter 300. Following a hearing in the superior court a decree was entered granting the prayer of the petition. From the entry of that decree the respondent duly appealed to this court.

The petition sets out in substance that on February 29, 1944 the respondent received an injury by accident arising out of and in the course of his employment by the petitioner; that the latter has continuously paid the respondent compensation at the rate of $20 per week from March 1, 1944, under an agreement entered into by them and approved by the director of labor; that under another petition for review, previously filed, a decision was rendered denying that the incapacity of the respondent had diminished or ended; and that the respondent has refused to comply with the recommendation of an impartial medical examiner and of a doctor who examined him on behalf of the petitioner that he undergo the myelogram test. The petitioner prays that the agreement be reviewed and that a decision be entered diminishing or discontinuing the payments of compensation or making such other order as justice may require.

The decree appealed from reads as follows: "that the respondent submit within sixty (60) days from the date of this decree to the myelogram test, such test to be made or performed by Dr. William A. Horan or by some other surgeon of established reputation for skill in making this particular test, and that all hospital and medical bills reasonably incident to said test be assumed and borne by the petitioner; that if the respondent decline to submit to said test, that the petitioner may terminate compensation under the Act to the respondent."

This decree contains no ultimate findings of fact as required by the pertinent statute, G. L. 1938, chap. 300, art. III, §6. This deficiency possibly would be a cause for sending the matter back to the superior court to have the omission supplied. However, the parties seem to be in agreement and have argued on the basis that, because of statements in the rescript of the trial justice, the decree inferentially contained findings that the above-named test was reasonably necessary and came within the provisions of the statute, G. L. 1938, chap. 300, art. II, §21, as amended, which requires an injured employee to submit himself to "an examination" by a doctor

in order that the nature of his disability, if any, might be determined.

The evidence in the cause shows that the respondent, who was about thirty-six years of age, married and having a family, is still totally incapacitated by reason of the injury above mentioned. In the agreement entered into by the parties this injury is set out as a "Sacro-iliac strain". It also appears from the evidence that from time to time he has been treated by several doctors and by the Curative Centre in addition to being examined by Dr. Horan in July, 1945. It is admitted that soon after such examination the petitioner's insurer, by registered letter, asked the respondent if he was willing to have the test in question made, offering to pay the expenses thereof.

The respondent refused to undergo the test because, according to his testimony, he had heard of and had seen people who were crippled or injured by it, and he gave the names and addresses of several such persons. He also stated that, in this connection, he received advice from several doctors who had treated him, and that at the time he was testifying he was receiving medical attention.

Doctor William A. Horan was the only witness for the petitioner and the only medical witness who testified. In his testimony he stated in substance that, after examining the respondent and obtaining his history, he came to the conclusion that the respondent could have a ruptured intervertebral disc which might be affecting the sciatic nerve, since in a neurological examination, which was incorporated in the physical examination, he had certain symptoms indicating that condition. The doctor then testified that "There is a method which contributes immensely towards the diagnosis of a ruptured intervertebral disc" and stated that it is called the myelogram test. The object of the test is to determine whether a ruptured disc was the cause of the sciatic condition which the examining doctor believed the respondent could be suffering from. The test requires hospitalization, the pa-

tient entering in the morning, having the test about noon-time, and leaving some time the next day.

In his evidence the doctor stated that the test is given in substantially the following manner. The patient, while under a local anesthetic, is placed on the fluoroscope or X-ray table and is given a lumbar puncture. While the needle is inserted in the spine a gauge is placed on the needle, various readings are taken, and thereafter fluid is withdrawn and sent to the laboratory for chemical examination. Then an opaque solution is injected into the spine, the needle remaining in place; the room is darkened and the patient is tilted back and forth and the solution in the spine, moving in either direction, works like a bubble in a carpenter's level. If there is nothing pressing on the spinal tube the solution will run up and down easily, but if there is some obstruction the solution as it goes down reveals such obstruction by passing around it. A camera-like arrangement on the X-ray table can be adjusted to take a picture of any place in the patient's spine desired by the doctor, especially a picture of the obstruction, if any appears. These pictures are developed immediately and checked with the visual showing in the fluoroscope. After the test is completed the solution is moved so that it goes directly under the needle and then it is removed with a syringe.

The doctor further testified that he had given a great many of these tests; that he had never had a fatal result; and that in his opinion the test was not dangerous to life. However, in cross-examination he gave the following testimony: "Q. And so you suggested a myelogram test for the purpose of further enabling you to make a diagnosis, is that correct? A. Yes, sir. Q. I mean there is nothing about the myelogram test that is curative at all? A. No. Q. It is all for diagnostic purposes, is that correct? A. That is right. . . . Q. As a matter of fact, in some instances an individual has to submit to more than one myelogram test in order to have a diagnosis finding made, is that not so? A. Yes."

As to the possible effect of the test upon a patient, the doctor testified that in some instances it gives a headache which he has seen continue for a week depending upon the follow-up treatment. He also stated in his testimony: "Q. Do you know of cases in which the myelogram test was followed by either total or partial paralysis? A. I don't know a case. I have heard—Q. You have heard of such cases? A. — of such cases." He further said: "There is an occasional case here and there, something like you describe happens, but it also happens with anesthesia, it also happens in anything; and because of that I think I am within my rights in saying that the myelogram is not dangerous because of the very rare instances that these things happen." In addition the doctor testified that when the needle is injected into the spine it comes in close proximity to the nerves and probably pushes them aside by coming in contact with them; but he admitted, in answer to another question, that it was possible that the needle might puncture a nerve.

The petitioner contends that under the provisions of G. L. 1938, chap. 300, art. II, §21, as amended, the respondent is bound as a matter of law to submit to the myelogram test. The respondent contends that the requirement of the statute is to submit only to an examination but not to a test that is in effect an operation without any intended curative results. The section of the statute, as amended, reads in part as follows: "The employee shall, after an injury, at reasonable times during the continuance of his disability, if so requested by his employer, submit himself to an examination by a physician or surgeon authorized to practise medicine under the laws of the state, furnished and paid for by the employer. . . . If such employee refuses to submit himself for any examination provided for in this chapter, or in any way obstructs any such examination, his rights to compensation shall be suspended and his compensation during such period of suspension may be forfeited."

In support of their respective positions the parties have called to our attention several decisions from other jurisdic-

tions in which it appeared that the injured employee had refused to submit to an operation which was designed to cure him of his injury or at least to improve his condition. In our opinion none of these cases is directly in point. Operations and other treatments designed reasonably to cure or to improve an injured employee's condition are not covered by any statutory enactment in this state but are governed by the general principles of law applicable to the facts in each case.

Speaking generally an injured employee is under a duty to cooperate with those concerned in his welfare by submitting himself to any reasonable curative treatment not involving risk to life or limb or unnecessary pain or discomfort, to the end that his health may be restored or his injury lessened as soon as possible. See annotations in 73 A. L. R. 1315 and 105 A. L. R. 1479; *Snooks's Case,* 264 Mass. 92. This court impliedly has recognized the above principle in a case involving the submission to a curative operation for a hernia. *Bishop* v. *Morrow Co.,* 68 R. I. 518. The question whether an injured employee's refusal to submit to such an operation or treatment is unreasonable is ordinarily one of fact to be determined from the circumstances of the particular case. On the other hand, the controlling question in the instant case is the extent to which an injured employee must submit himself for an "examination" as contemplated in the statute previously quoted.

The trial justice in his rescript held that it was reasonable to require the respondent to submit himself to the myelogram test. It is our opinion that in making his decision he committed an error of law in misconstruing the word "examination", as used in the statute, by giving such word too broad and comprehensive a meaning. In determining its meaning in this section the problem is to find, if possible, the legislative intent. We are of the opinion that in using the term "examination" in this connection the legislature had in mind the ordinary physical examination customarily given by doctors, together with such tests as are reasonably connected therewith and do not involve unnecessary risk to

the patient's health. It is our judgment that if the legislature had intended that an injured employee should be required as a matter of law to submit to such a test as the myelogram test, hereinbefore described, it would have expressed that intent in more specific or comprehensive language and would not have left it to be inferred from the term "examination". On the present wording of the statute we think that the term "examination" does not contemplate what, according to the evidence in this case, would in effect be an extensive operation for mere diagnostic confirmation.

The test admittedly was merely to verify and assist in confirming a diagnosis already made, but would in no way relieve or cure the patient of his injury, which apparently must be treated by some other operation if the diagnosis is correct. The employee had already submitted to several examinations in the ordinary sense. On the evidence here the test was not without considerable risk to the patient's bodily health, and appears to be operative in its nature without any possible direct curative effect. In our opinion such test went beyond the reasonable scope of an "examination" as contemplated by the present language in the statute, and the respondent did not act unreasonably in refusing to submit himself to such a test. For these reasons the trial justice was in error in basing his decision in effect on an interpretation of the statute which would make the myelogram test, as described in the evidence, come reasonably within the scope of the word "examination".

We find no case in this state which is contrary to our conclusions herein; and no case from any other jurisdiction has been cited to us under a comparable statute, where the term "examination" has been held as a matter of law to include a test which compares in nature and effect with the one disclosed by the evidence here. On the other hand, while not precisely in point, it was held in *Burns* v. *Aetna Life Ins. Co.*, 95 Mont. 186, under a similar statutory provision as to examination, that an employee who had submitted to several ordinary examinations was not unreasonable in refusing to

undergo a further experimental test, which appears to be less dangerous than the one described by the evidence in the instant case.

The respondent's appeal is sustained, the decree appealed from is reversed, and the cause is remanded to the superior court for further proceedings.

*Francis V. Reynolds,* for petitioner.

*Sidney L. Rabinowitz,* for respondent.